**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-cr-00323-RFB-NJK |
| Plaintiff, | **ORDER** |
| v. | |
| TONY NIVONGSO, | |
| Defendant. | |

### I.    INTRODUCTION

Before the Court is Mr. Tony Nivongso's Motion to Suppress [ECF No. 24]. The Court held an evidentiary hearing on this Motion on March 4, 2021. [ECF No. 63] For the reasons stated below, the Court grants the Motion to Suppress.

### II.   FACTUAL FINDINGS

The Court makes the following factual findings based upon consideration of all of the evidence submitted at the evidentiary hearing in this case.

On October 25, 2019, Jon Payne, a security investigator for the Rio Hotel in Las Vegas, was investigating reports of fraudulent credit card purchases made at a jewelry store inside of an affiliated hotel, Caesar's Palace. This investigation revealed that a suspect named "Dennis Ramirez" (who was later identified as Arturo Vasquez-Rodriguez) was registered as a guest to Room 2013 located on the twentieth floor of the Ipanema Tower at the Rio Hotel.

Payne contacted the Las Vegas Metropolitan Police Department ("Metro") in a 911 call to report the fraudulent activity and the individual suspected. He identified a single male suspect, Vasquez-Rodriguez, who was "Hispanic," "heavy set," and "bald." Payne was able to offer this

description because he had surveillance video footage and a photo of the suspect's ID.

Metro Officer Joshua Bromley was one of a few officers dispatched to the Rio to investigate the allegation of fraudulent transactions with a fake credit card. Bromley and the other officers met with Payne at the Rio Hotel around 4:30 p.m. Bromley and the other officers were told the description of Vasquez-Rodriguez by Payne and they viewed video surveillance of Vasquez-Rodriguez which matched the physical description which Payne had consistently provided to Metro. Bromley did not receive a report of any other suspects nor did he receive information that the one Hispanic male suspect was considered armed or dangerous.

Bromley and the other officers were told that Vasquez-Rodriguez and a female named Carlotta Quezada were registered to Room 2013. He did not receive information that a Tony Nivongso or Thanh Tran were registered to the room.

Bromley, other Metro officers and Rio security officers went to Room 2013 around 5:37 p.m. to see who was in the room. When officers knocked on the door, they encountered two women and a child in the room. No one else was in the room. One of the women was identified as Carlotta Quezada. One of the women had fraudulent credit cards in her possession. The two women were detained and the three were escorted downstairs by Metro detectives. Bromley remained as the sole uniformed Metro officer outside of Room 2013 along with hotel security personnel.

Around 7:15 p.m., Bromley was standing outside of Room 2013 when he saw three individuals walking towards him. As they approached, he identified one of them as the suspect Vasquez-Rodriguez in the video footage. He also saw a woman and a slender Asian man, who was later identified as Tony Nivongso. Bromley noticed that Nivongso had a white backpack. Bromley then observed the three individuals turn around and start walking away from him. Vasquez-Rodriguez pulled ahead of the other two individuals walking. Bromley ran past the woman and Nivongso to pursue Vasquez-Rodriguez. He caught Vasquez-Rodriguez at the elevator bank and detained him. He handcuffed Vasquez-Rodriguez and patted him down for weapons. He did not find any weapons. Bromley then detained the woman but he did not place her in handcuffs. Bromley asked a hotel security officer to watch Vasquez-Rodriguez and the woman, both of whom were detained near the elevator bank.

Bromley noticed that Nivongso had continued to walk away from everyone. Out of sight of Bromley, Nivongso entered the VIP Lounge on the twentieth floor. Nivongso placed his backpack in one of the cabinets and closed the door to the cabinet. The cabinet was not locked. This floor and this room, however, are only accessible by individuals who have key card access or by individuals accompanied by those who have key card access. Nivongso then moved away from the cabinet to the entryway to the VIP room. Nivongso did not leave the VIP Lounge. Bromley soon found Nivongso in the VIP room. He then placed his hands on Nivongso and physically guided him out of this room.

After physically removing Nivongso from the VIP room, Bromley handcuffed Nivongso near the elevator bank where the other two individuals were being detained. Bromley patted Nivongso down and did not find any weapons or any contraband. Bromley then walked back into the VIP room to search it. Bromley found Nivongso's white backpack inside of a closed cabinet in the VIP room. The backpack was zipped up and Bromley could not see anything inside. He did not notice or recognize the feel or bulge of any weapons or any other obvious contraband. He brought the backpack to the area where all three were detained and placed the backpack down near the woman who had been detained. Bromley then informed his dispatch radio operator that he had three people in custody and to notify the detectives downstairs in the Rio.

Bromley then walked all three detained individuals back to the area of Room 2013. Bromley conducted a second pat down search of Vasquez-Rodriguez. He retrieved Vasquez-Rodriguez's wallet and found multiple IDs in the wallet. Bromley conducted a second pat down search of Nivongso. He again did not find any weapons or contraband on Nivongso. Bromley then asked Nivongso for ID. Nivongso provided Bromley with an ID that identified him as Thanh Tran.

Bromley quizzed Nivongso about basic information on the ID. He asked Nivongso about the name on the ID, the birthdate and address. Nivongso correctly answered these questions. Bromley then asked for a background check on all three individuals. Bromley asked Nivongso for his social security number and Nivongso indicated that he did not remember the number. Bromley was then told over the radio that none of the three individuals had active warrants and there was no criminal history listed for Thanh Tran.

Bromley did not ask any substantive or investigative questions of Nivongso for the next 40-50 minutes. He did tell Nivongso and the others who were detained that they were "waiting" for the detectives to arrive. He also told Nivongso during this waiting period that if Nivongso ever hears a police officer telling him to stop, that he should stop and not try to continue walking away and hide a backpack.

Around ninety minutes after Nivongso was initially detained and handcuffed by Bromley, other officers and detectives arrived who searched Nivongso's backpack. Officers found inside of the backpack a gun, drugs, and forged credit cards. Nivongso was compliant with Bromley during the entirety of his detention. The officers never obtained a warrant to search the backpack.

### III.   LEGAL STANDARD

The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable searches and seizures by the government. U.S. Const. amend. IV. Police officers may conduct a brief investigatory stop of an individual. Terry v. Ohio, 392 U.S. 1, 22 (1968). To initiate a Terry stop to investigate potential criminal activity, a stop that does not rise to the level of an arrest, an officer must have reasonable suspicion to believe "criminal activity may be afoot." Id. at 30; United States v. Arvizu, 534 U.S. 266, 273, (2002). This means the officer must have reasonable suspicion "the person apprehended is committing or has committed a criminal offense." Arizona v. Johnson, 555 U.S. 323, 326 (2009). "Generally, a Terry stop involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." United States. v. Miles, 247 F.3d 1009, 1012 (9th Cir. 2001) (internal citations omitted). Importantly, while a Terry stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect is armed and presently dangerous to the officer or to others. Thomas v. Dillard, 818 F.3d 864, 876 (9th Cir. 2016) (internal citations omitted). "A lawful frisk does not always flow from a justified stop." United States v. Thomas, 863 F.2d 622, 628 (9th Cir. 1988).

In determining whether an investigatory stop has turned in an arrest requiring probable cause, courts must examine the "totality of circumstances." Washington v. Lambert, 98 F.3d 1181,

1185 (9th Cir. 1996). In looking at the totality of the circumstances, courts must "consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." Ibid. Moreover, courts must evaluate the intrusiveness of the stop based upon "whether the methods used were reasonable given the specific circumstances." Ibid. Consequently, "while certain police actions constitute an arrest in certain circumstances, e.g. where the 'suspects" are cooperative, those same actions may not constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists." Ibid. (internal citations omitted).

An investigatory stop that ripens into an arrest must be supported by probable cause. United States v. Ricardo, 912 F.2d 337, 342 (9th Cir. 1990). To demonstrate probable cause, the government may only rely upon information known or ascertained prior to the arrest and not after the seizure has occurred. Ibid. An individual's mere association with others for whom there is probable cause to arrest does not establish probable cause for that individual. Sibron v. New York, 392 U.S. 40, 62–63 (1968) (holding police lacked probable cause to arrest defendant simply because defendant was observed talking to narcotics addicts and traffickers).

A warrantless search is *per se* unreasonable under the Fourth Amendment, subject to only a "few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967); see also United States v. Martin, 693 F.2d 77, 78 (9th Cir. 1982) (holding that a search of a bag, absent exigent circumstances, required a warrant).

"A person has an expectation of privacy in his or her private, closed containers" and "does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner." United States v. Fultz, 146 F.3d 1102, 1105 (9th Cir. 1998). "Closed packages or containers, such as [a] backpack, 'are in the general class of effects in which the public at large has a legitimate expectation of privacy,' making warrantless searches of them 'presumptively unreasonable.'" United States v. Young, 573 F.3d 711, 721 (9th Cir. 2009) (quoting United States v. Jacobsen, 466 U.S. 109, 114-15 (1984)).

"If a person has voluntarily abandoned property, he has no standing to complain of its search and seizure." United States v. Cella, 568 F.2d 1266, 1283 (9th Cir. 1977). "[A]bandonment

is a question of intent." United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir. 1986); see also United States v. Jackson, 544 F.2d 407, 409 (9th Cir. 1976). Courts must look at the totality of circumstances and "focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." Nordling, 804 F.2d at 1469. In making this determination, courts look to two important factors: (1) denial of ownership and (2) physical relinquishment of the property. Ibid.

### IV.    DISCUSSION

The Court finds that the Government has not established that the law enforcement officers and detectives in this case had lawful authority to search Nivongso's backpack.

#### A. No Probable Cause for Extended Detention of Nivongso

The Court first finds that, while Bromley may have had a reasonable basis to briefly detain Nivongso, he did not have a basis to extend the stop, and that the extension of the stop resulted in a de facto arrest for which there was no probable cause.

First, the Court finds that Bromley unlawfully extended the investigatory stop beyond its legal justification. The Court finds that based upon the circumstances, Bromley had a sufficient basis to briefly detain Nivongso to determine his relationship to Room 2013 and Vasquez-Rodriguez. The Court further finds that within the first 30 minutes of conducting the investigatory stop, a.) Bromley had conducted two pat-down searches of Nivongso without finding contraband, b.) Bromley had received no information regarding warrants on the background check based on the ID Nivongso provided, c.) Bromley had not directly observed Nivongso committing a crime, d.) Bromley had not received any information suggesting that Nivongso was involved with Vasquez-Rodriguez' alleged conduct, and e.) Bromley had not received any information to establish that Nivongso had committed or was about to commit a crime. Within that time, Nivongso had also provided an ID and had correctly identified the information on that ID.[1] The

---

[1] The Court does acknowledge that Nivongso told Bromley that he did not remember his social security number. However, the Court finds based upon Bromley's testimony that Bromley did not at the time find this to be suspicious, nor did he report to anyone else that Nivongso was suspicious for reasons other than that he was in the presence of Vasquez-Rodriguez.

only information known to Bromley is that Nivongso was in the presence of an individual who had been identified as using fraudulent credit cards. However, Bromley had no information that Nivongso was previously identified as a suspect or that someone fitting his description had engaged in criminal conduct. Bromley therefore had no legal basis to extend the Terry stop for further investigation. See Sibron, 392 U.S. at 62–63.

The Court also finds that after approximately 30 minutes, Bromley stopped asking Nivongso questions almost entirely. His only communication in the subsequent 40-50 minutes was to tell Nivongso not to run from the police and hide his backpack, and to tell him that they had to wait for the detectives. The Court thus finds that Bromley did not have a lawful justification to detain Nivongso after approximately 30 minutes. See Graves v. City of Couer D'Alene, 339 F.3d 828, 843-44 (9th Cir. 2003) (finding no probable cause where an investigatory stop of an individual carrying a backpack at an Aryan Nations parade "did not develop any further facts that would increase a reasonable officer's suspicion"). The Court finds that Nivongso was only being detained because he had been seen with Vasquez-Rodriguez and had attempted to hide his backpack. The Court thus finds that Bromley's extension of the stop after completing his investigation and for the simple purpose of holding Nivongso was unlawful.

Relatedly, the Court finds that after approximately 30 minutes the detention had clearly ripened into a seizure or arrest. Nivongso was not free to leave. He was handcuffed. He had been patted down twice. He had had his belongings—his backpack—seized without his consent. He was being held without his consent. Nivongso was forcibly removed from the VIP room, and seated and handcuffed in the hallway of the hotel, while being stood over by three to four armed uniformed Metro officers and hotel security. See Fla. v. Royer, 460 U.S. 491, 505 (finding that an investigative detention ripened into a seizure requiring probable cause when defendant was brought to a separate room); United States v. Juvenile (RRA-A), 229 F.3d 737, 743 (9th Cir. 2000) ("[W]e conclude that [the respondent's] handcuffing was the clearest indication that she was no longer free to leave and therefore find it to be the point of arrest."); Orhorhaghe v. INS, 38 F.3d 488, 494 (9th Cir. 1994) (finding a seizure where an individual was "outnumbered" by "the threatening presence of several officers"). Bromley had stopped asking substantive questions and

was not conducting any further investigation related to the initial purpose for the stop. In short, there was no further basis to hold Nivongso, yet Nivongso was detained for another 40-50 minutes. See United States v. Place, 462 U.S. 696, 709 (1983) (stating that, "in assessing the effect of the length of detention" on whether a seizure is unreasonable, courts should "take into account whether the police diligently pursue their investigation"). Nivongso was told that he would have to wait for detectives before he could be released. The Court thus finds that Nivongso's detention had ripened into an arrest before the detectives arrived to search his backpack, but that Metro lacked probable cause to arrest Nivongso and prolong his seizure.

The Government has also failed to meet its burden for establishing that the officers and detectives had sufficient legal authority to search Nivongso's backpack. Nivongso did not consent to his backpack being searched. He was not lawfully under arrest, so he could not be searched incident to arrest.[2] United States v. Gooch, 6 F.3d 673, 680 (9th Cir. 1993). Even if he had been under arrest, the Government has not demonstrated why the police could not have obtained a warrant. Indeed, the police waited more than an hour before they searched the bag. See United States v. Monclavo-Cruz, 662 F.2d 1285, 1287 (9th Cir. 1981) (rejecting warrantless search of a purse seized incident to arrest when the search occurred "more than an hour after police gained exclusive control of it").

The Court also finds that Nivongso retained an expectation of privacy in his zipped-up backpack and that he did not abandon his backpack. The Court finds that Nivongso placed his backpack within the cabinet in the VIP lounge with the intent of retrieving it after the officers and security left. He did not intend to abandon this backpack to the public or even to other guests. He simply sought to conceal it from law enforcement. The Court finds that he did not voluntarily leave the VIP room. He did not intentionally move out of eyesight of the cabinet that concealed his backpack. He was forcibly removed from the VIP room and away from his backpack. He never disclaimed ownership of the backpack. See United States v. Huffhines, 867 F.2d 314, 318 (9th Cir. 1992) (finding defendant abandoned his car by denying both ownership and knowledge of it). He

---

[2] Additionally, while Bromley appears to have said to the hotel security officer that he was "pretty sure" there could be a gun in the backpack, the Court finds that this was mere speculation. He did not provide credible testimony to support this supposition.

- 8 -

never acted as if he did not have an expectation of privacy in the backpack. For the entire time that he was detained and the backpack seized, Nivongso never suggested or intimated that it was not his backpack or that he was disclaiming ownership. Moreover, the Court finds that the VIP lounge was not generally accessible to the public or even to most hotel guests. The Court finds that Nivongso would have understood this based upon being in the elevator which explicitly required key card access for entry onto the twentieth floor. For all of these reasons, the Court finds that Nivongso did not abandon his backpack and did not relinquish his expectation of privacy in his closed backpack. See United States v. Jackson, 544 F.2d 407, 409 (9th Cir. 1976) (finding no abandonment when suspect drops bag and walks away from police in an airport).

Finally, the Court finds that all of the physical and testimonial evidence obtained as a result of Nivongso's extended detention, de facto arrest, and the unlawful search of his backpack must be suppressed as the fruit of an unlawful search and seizure. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

### V.   CONCLUSION

**IT IS HEREBY ORDERED** that the Motion to Suppress [ECF No. 24] is GRANTED.

**DATED:** November 22, 2021.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**